1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID P.,[1]<br><br>                                Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration,<br><br>                                Defendant. | Case No.:  22cv906-LR<br><br>**ORDER REGARDING JOINT MOTION FOR JUDICIAL REVIEW**<br><br>**[ECF No. 18]** |

On June 22, 2022, Plaintiff David P. ("Plaintiff") filed a Complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Defendant") denying Plaintiff's application for a period of disability and disability insurance benefits.  (Compl., ECF No. 1.)  Now pending before the Court is the parties' Joint Motion for Judicial Review.  (See J. Mot. Judicial Review, ECF No. 18 ("J. Mot.").)  For the reasons set forth below, the Court **ORDERS** that judgement be entered reversing the decision of the Commissioner and remanding this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

---

[1] In the interest of privacy, this Order uses only the first name and the initial of the last name of the non-government part or parties in this case.  See S.D. Cal. Civ. R. 7.1(e)(6)(b).

1

## I. PROCEDURAL BACKGROUND

On January 12, 2018, Plaintiff filed his first application for disability insurance benefits, alleging disability beginning on June 6, 2017.  (See Certified Admin. R. 289, ECF No. 10 ("AR").)  On May 29, 2018, the application was denied initially (see id. at 122); and was denied upon reconsideration on August 15, 2018.  (See id. at 127.)  On April 21, 2020, a hearing regarding Plaintiff's application was held before Administrative Law Judge ("ALJ") Richard Breen.[2]  (Id. at 91.)  An impartial medical expert, Dr. James McKenna, and a vocational expert ("VE") testified at the April 21, 2020 hearing.  (Id. at 91, 118.)  On May 4, 2020, ALJ Breen determined that Plaintiff was not disabled between his alleged disability onset date of June 6, 2017, and the date of his decision. (See id. at 107.)   After Plaintiff requested that the Appeals Council Review ALJ Breen's decision (see id. at 223) the Appeals Council remanded Plaintiff's case to an administrative law judge on September 24, 2020 to resolve a conflict between the vocational expert testimony offered at the April 21, 2020 hearing and the Dictionary of Occupational Titles.  (Id. at 118-19.)

On April 21, 2021, a new hearing was held before ALJ Kevin Messer, during which Plaintiff was represented by counsel.  (Id. at 39.)  A VE was also present at the second hearing.  (See id. at 58-59.)  On May 5, 2021, ALJ Messer found that Plaintiff was not disabled between his alleged disability onset date of June 6, 2017 and the date of his decision.  (Id. at 29-30.)  On June 30, 2021, Plaintiff requested that the Appeals Council review the ALJ's decision.  (See id. at 286.)  On April 29, 2022, the Appeals Council denied Plaintiff's request to review the ALJ's second decision.  (See id. at 2.) Plaintiff filed the instant civil action on June 22, 2022.  (See Compl., ECF No. 1.)

---

[2] The Court notes that the transcript of the hearing before ALJ Breen, including the testimony of Dr. McKenna, was not included in the Administrative Record.  Any citations to the first hearing on Plaintiff's disability application are to ALJ Breen's written decision, rather than the hearing itself.

## II.    THE SEQUENTIAL DISABILITY PROCESS

The initial burden of proof rests upon the claimant to establish disability.  See Howard v. Heckler, 782 F.2d 1484, 1486 (9th Cir. 1986).  To meet his burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner has established a five-step process for determining whether a person is disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.  At the first step of the five-step sequential evaluation process, the ALJ must determine if a claimant is engaged in "substantial gainful activity;" if so, the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At the second step, the ALJ must determine whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted or is expected to last for a continuous period of at least 12 months; if not, the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); see also 20 C.F.R. §§ 404.1509, 416.909.  At the third step, the ALJ must determine if the claimant's impairment(s) meets or equals that of a listed impairment; if so, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  At the fourth step, the ALJ must determine whether, based on the claimant's residual functional capacity, the claimant can perform his or her past relevant work; if so, the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At the fifth step, the ALJ must determine whether, based on the claimant's residual functional capacity, age, education, and work experience, the claimant can make an adjustment to other work; if so, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(v), 416.920(a)(4)(v).

## III.    SUMMARY OF THE ALJ'S FINDINGS

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability on June 6, 2017.  (See AR at 19.)  At step two, the ALJ found that Plaintiff had the following impairments: "Meniere's disease,

lumbar radiculopathy, cervical and lumbar strain/sprain, degenerative disc disease of the cervical and lumbar spine, left carpal tunnel syndrome, mild tendinosis of left shoulder status-post surgical repair, left knee meniscus tear, and mild bilateral sensorineural hearing loss." (Id. at 20.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments. (See id. at 21.)  Next, the ALJ determined that Plaintiff has the residual functional capacity ("RFC") to "perform light work as defined in 20 CFR 404.1567(b) except as follows:

> he can lift no more than 10 pounds with the non-dominant left upper extremity; can occasionally climb ramps and stairs, but never climb ladders, ropes and scaffolds; can occasionally perform balancing, stooping, kneeling, crouching and crawling; can frequently reach overhead with the non-dominant left upper extremity; can frequently handle and finger with the non-dominant left upper extremity; and must avoid concentrated exposure to loud noise.

(Id. at 22.)

At step four, the ALJ adduced and accepted the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC would not be able to perform his past work.  (See id. at 28.)  The ALJ then proceeded to step five of the sequential evaluation process. (See id.)  Based on the vocational expert's testimony, the ALJ concluded that, "considering [Plaintiff's] age, education, work experience, and residual functional capacity, [Plaintiff] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and was therefore not disabled.  (See id. at 28-30.)

In determining that Plaintiff was not disabled prior to his disability date, the ALJ found that "[Plaintiff's] medically determinable impairments could reasonably be expected to cause [his] alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of the these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Id. at 23.)  In

reaching this finding, the ALJ discussed the opinions of multiple doctors, including those of Behnam Sam Tabibian, M.D, and Richard M. Siebold, M.D., which were rendered in the context of workers' compensation claims for a shoulder injury he sustained while working as a boom operator for a production company in June of 2017.  These findings and their effect on the ALJ's ultimate disability determination are discussed in further detail below.  (See Section VI.A.2-3, supra.)

## IV.    RELEVANT FACTUAL BACKGROUND

### A.    Relevant Medical History

Plaintiff's shoulder symptoms stem from an injury he suffered while working as a boom operator on June 7, 2017.  (See id. at 655, 667.)  While holding the ten-pound boom, Plaintiff "felt a pop to his left shoulder and experienced headaches and pain to his neck, left wrist, left hand, with numbness."  (Id. at 655.)  Due to persistent pain, he was seen by the "company doctor" and referred for physical therapy and orthopedic treatment; MRI studies were performed and he was given a cortisone injection.  (Id.)  The physical therapy provided only "very temporary relief."  (Id. at 661-62.)

A July 22, 2017 MRI, read by Drs. Wong and Rosenblum, showed left tendinopathy, tears of the superior and posterior labra, capsular hypertrophy of the acrominoclavicular ("AC") joint, impingement risk, and injuries to the cervical spine at C3 through C7, including narrowing, desiccation, and hypertrophy.  (Id. at 652, 672, 869.)  On July 24, 2017, Dr. Molnar reported that Plaintiff suffered from constant numbness, tingling, and weakness in his left hand and left shoulder pain that together caused an "impairment in getting dressed, putting on socks and shoes, doing housework, driving, and sleeping through the night."  (Id. at 800.)  On July 31, 2017, Dr. Rosenblum evaluated Plaintiff and found bicep tendonitis, left shoulder impingement syndrome, radiculitis of the left cervical region, and an unspecified sprain of the left shoulder, resulting in moderate-severe left shoulder pain.  (Id. at 862-64.)

On September 18, 2017, Mark Ganjianpour, M.D., examined Plaintiff and prepared an initial orthopedic evaluation report.  (See id. at 661.)  Dr. Ganjianpour reported

Plaintiff's complaints of (1) a burning sensation and constant moderate neck pain which intensified when supine, (2) a burning sensation and constant moderate-severe left shoulder pain which radiated to the left arm, (3) numbness and tingling in hands, and (4) extreme headaches, dizziness, sensitivity to light, and blurry vision.  (See id. at 662-66.) He reported that Plaintiff had difficulty showering, dressing, putting on shoes, sleeping, and doing any sudden lifting.  (Id. at 663.)  Dr. Ganjianpour reported that Plaintiff had (1) injuries to the cervical spine at C6-C7, (2) rotator cuff tendinopathy, (3) some tearing of the left posterior and superior labrum, (4) shoulder impingement, and (5) stiffness and spasm of the cervical spine.  (Id. at 662-66, 675-76.)

### 1.   Pre- and post-operative evaluations

On May 25, 2018, Plaintiff underwent surgery that entailed a left shoulder arthroscopy, debridement of the superior and anterior labrum, chondroplasty of the glenoid, repair of the posterior labrum and subacromial decompression.  (Id. at 784.)  The surgery was performed by Richard D. Ferkel, M.D., who saw Plaintiff eight times between March 13, 2018 and August 9, 2018.  (See id. at 784, 786, 788, 797, 956, 960, 963.)  Before surgery Dr. Ferkel had evaluated Plaintiff as "temporarily totally disabled," due to left shoulder impingement, AC joint tendinopathy, labral tear, glenohumeral articulation tear, and cervical spine injuries at C5-C7.  (Id. at 788, 797-98.)

The surgery apparently did not fully ameliorate Plaintiff's symptoms.  In his postoperative examinations in the summer and fall of 2018, Dr. Ferkel reported that Plaintiff continued to suffer from various degrees of pain, discomfort, numbness in his neck, shoulder, and left upper extremity.  (See id. at 784, 786, 956, 960, 963.)

Plaintiff's post-operative injuries were evaluated in an October 8, 2018 MRI read by Dr. Modawer and an October 24, 2018 orthopedic examination and review of records which was conducted by Dr. Haronian.  (See id. at 944-53, 958-59.)  Dr. Modawer diagnosed Plaintiff with (1) chronic cervical strain, (2) moderate degenerative disc disease at C6-C7, (3) mild bilateral carpal tunnel syndrome, and (4) mild diffuse central disc protrusion at C6-7.  (Id. at 958.)  Dr. Haronian diagnosed Plaintiff with Lumbosacral

radiculopathy, reporting that Plaintiff showed spasm, tenderness, and guarding in the musculature of the lumbar spine, that plaintiff walked, raised his leg, and squatted with pain, and that Plaintiff's bilateral deep tendon reflexes were reduced.  (See id. at 949-951.)  Dr. Haronian reported Plaintiff's complaints of episodic difficulty with showering, dressing, grooming, and house chores.  Plaintiff noted that he avoided standing, walking, sitting, and driving for prolonged periods of times and lifting greater than 10 pounds.  (See id. at 949.)  Dr. Haronian recommended Plaintiff as a candidate for epidural steroid injections and/or decompressive spine surgery.  (Id. at 951-52.)

### 2.    Dr. Tabibian

Plaintiff saw Dr. Tabibian, an orthopedist, nine times between November 28, 2017 and May 16, 2018.  (See id. at 748-749, 678-82, 690, 695, 702, 720, 726, 732, 737, 755.)  Dr. Tabbibian's reports which that were included in the AR were made for insurance claims in his capacity as the primary treating physician for Plaintiff's June 2017 injury.  At these appointments, Plaintiff complained of neck pain that was initially described as "severe and shooting," then as "moderate-severe," then, at each of the last six appointments, as "constant severe neck pain with radiating pain to the left arm with numbness."  (Id.)  Throughout these appointments, Plaintiff complained of headaches which varied in intensity between "very severe and crippling" in January and February 2018, to "debilitating" in February, March, and April 2018, to "intense" in April and May 2018, to "slight" in March 2018.  (Id.)  At each appointment, Plaintiff complained of "moderate to severe" left shoulder pain and light to moderate right arm and left upper extremity pain, tingling, and numbness.  (See id.)  Plaintiff complained of intermittent lower back and bilateral knee pain in November, 2017, as well as February, April, and May of 2018, the magnitude of which he noted varied between light and severe.  (Id. at 748-749, 690, 732, 737, 755.)  In November 2017, Plaintiff reported an uneven gait and claimed to have difficulty sleeping, standing, walking, kneeling, squatting, using stairs.  (See id. at 748-49.)  Plaintiff complained of those same locomotive difficulties in February 2018. (Id. at 695.)

Dr. Tabibian diagnosed Plaintiff with (1) cervical spine ligament sprain, (2) cervical radiculopathy, (3) neck sprain, (4) left shoulder impingement, (5) unspecified left rotator cuff injury, (6) sacroiliac joint sprain, (7) right shoulder girdle strain, (8) unspecified internal derangement of both knees, (9) right shoulder impingement, (10) unspecified bilateral knee strains, and (11) bilateral carpal tunnel syndrome.  (Id. at 681-82, 696, 705, 717, 723-724, 729, 735, 741, 752, 759.)

**B.    Final Longitudinal Reports**

**1.    Dr. Tabibian**

On July 1, 2019, Dr. Tabibian, Plaintiff's primary treating physician, evaluated Plaintiff's disabilities in a Permanent and Stationary Report that drew on a contemporaneous physical examination, Plaintiff's medical records, and Dr. Tabibian's history with Plaintiff, which dated back to November 28, 2017.[3]  (See id. at 1041-42.) The report was provided "to address the patient's current orthopedic residuals and the resulting permanent disability/impairment arising . . . during the course of employment." Dr. Taibibian diagnosed plaintiff with (1) Cervical and Lumbar musculoligamentous sprain/strains with attendant disc protrusions and desiccations, (2) right shoulder periscapular strain with tendinosis and minimal osteoarthritic changes, (3) left carpal tunnel syndrome and subclinical right carpal tunnel syndrome, (4) a left knee meniscus tear, (5) bilateral knee patellofemoral arthralgia, (6) left elbow medial epicondylitis, (7) bilateral sensorineural hearing loss and tinnitus, and (8) cervicogenic headaches.  (See id. at 1060-61.)

In the contemporaneous physical examination, Dr. Tabibian found tenderness to palpation over the extensor tendon and first dorsal extensor compartment at the left wrist. (See id. at 1056.)  Finkelstein's Test, Phalen's Test, and Tinel's Sign were positive for

---

[3] This history includes physical examinations on November 28, 2017 and February 5, 2018.  (See AR at 1041-42.)

Plaintiff's left wrist/hand and negative for his right.  (See id.)  In his examination of Plaintiff's knees, Dr. Tabibian found no swelling, atrophy or deformity, but did find a tenderness to palpation over the peripatellar area with crepitus, bilaterally.  (See id. at 1056-57.)  The Anterior and Posterior Drawer Tests and McMurray's Test were negative bilaterally and no motor weakness was noted in any major muscle group.  (See id.)  Plaintiff's knees had no mechanical symptoms of "catching, locking, or giving way."  (Id. at 1067.)  Dr. Tabibian also found varied symptoms of injury to Plaintiff's cervical spine, lumbar spine, and bilateral shoulders.[4]  (See id.)

Dr. Tabibian advised that Plaintiff's future medical treatment should include "courses of physical therapy, chiropractic, acupuncture, aquatic therapy, refills of prescription medication and replacement of support devices" during periods of symptom exacerbation.  (Id. at 1066.)  Dr. Tabibian also advised that additional cortisone injections and platelet-rich plasma injections should be available for Plaintiff's left shoulder and for his right shoulder if his condition worsens.  (See id.)  He also advised that Plaintiff should have access to carpal tunnel release surgery, symptom-dependent access to re-arthroscopy of his left shoulder, arthroscopic surgery to the right shoulder, cervical spine surgery, lumbar decompressive surgery, and arthroscopic surgery to the left knee.  (Id. at 1066-67.)  Dr. Tabibian determined that Plaintiff had the following work restrictions:

---

[4] These include (1) a forward head carriage with decrease in the lordotic curve, (2) mild tenderness to palpation and spasm over the cervical paraspinal muscles, bilaterally, (3) positive results for Cervical Compression and Spurling's Maneuver tests, (4) a significantly reduced range of motion in the cervical spine, (5) mild tenderness to palpation and spasm over the lumbar paraspinal muscles, bilaterally, (6) positive results for the Seated SLR Test, Supine SLR Test, and Kemp's Test, both right and left, (7) a significantly reduced range of motion in the lumbar spine, (8) tenderness to palpation over the subacromial region and posterior scapular muscles of the right shoulder and over the posterior scapular muscles at the right shoulder, (9) positive results for the Impingement, Cross Arm, and Joint Crepitus tests on the left shoulder, (10) a reduced range of motion in the left shoulder, (11) tenderness to palpation over the medial epicondyle and proximal forearm flexor muscle mass at the left elbow, (12) a positive result for the Reverse Cozen's Test in the left elbow, and (13) decreased sensation involving the left hand median nerve distribution.  (See id. at 1054-57.)

1
2
3
4
5
6
7
8
9
10

> With regard to the cervical spine residuals, the patient is precluded from lifting greater than 10 pounds and activities requiring repetitive motion and prolonged posturing of the head and neck.  With regard to the low back residuals, the patient is precluded from lifting greater than 10 pounds and activities requiring repetitive bending and stooping.  With regard to the left shoulder, the patient is precluded from lifting greater than 10 pounds, repetitive or forceful pushing, pulling, and repetitive above shoulder reaching.  With regard to the bilateral knees, the patient is precluded from repetitive kneeling, squatting, climbing, or prolonged weightbearing.  With regard to the left wrist and hand, the patient is precluded from lifting greater than 10 pounds and activities requiring repetitive or forceful gripping, grasping, and squeezing.

11
12
13
14

(Id. at 1066.)  Dr. Tabibian's assessed restrictions are very similar to the ones he had assessed in prior 2017 and 2018 Permanent and Stationary Reports regarding Plaintiff's conditions.  (See id. at 25) (comparing the reports from 2017 and 2018 with the July 2019 report).

15
16

### 2.    Dr. Siebold

17
18
19
20
21
22
23
24

On August 12, 2019, Dr. Siebold prepared a Final Permanent and Stationary Report ("Final Report") after a special supplemental Panel Qualified Medical Examination ("PQME") of Plaintiff and review of his medical records, in the worker's compensation context.  (See id. at 1081.)  Previously, Dr. Siebold had (1) reported on an October 2, 2018 PQME of Plaintiff with review of outside records, (2) filed a Supplemental Report thereto on January 13, 2019 after the examination of new medical records, and (3) reported on a second PQME with review of outside records after a comprehensive reexamination on May 28, 2019.  (See id.)  These reports were made in the workers' compensation context.

25
26
27
28

In the Final Report, Dr. Siebold found subjective complaints of limited range of motion in the left shoulder and of pain in the head, right and left neck, right and left shoulder, left arm, left hand, right hand with firm gripping, back, right knee with

22cv906-LR

squatting, and left knee with patellofemoral compression.  (<u>See</u> <u>id.</u> at 1095-1110.)  The Final Report included the following objective findings:

- Complaints of headaches dating back to 2014 and a prior diagnosis of cervicogenic headaches.  (<u>Id.</u> at 1095.)
- Injuries to the cervical spine, including disc disease at C5-C6, a protrusion with disc desiccation and some collapse at C6-C7, and an anterior bulge and possible slight collapse at C3-C4.  (<u>Id.</u> at 1097.)
- A "positive MRI" pertaining to residual complaints regarding the left shoulder injury.  (<u>Id.</u>)
- A prior left carpal tunnel finding and the "suggestion" of left carpal tunnel.  (<u>Id.</u> at 1101, 1103.)
- Lumbar spine disc disease at L4-L5 and L5-S1.  (<u>Id.</u> at 1105.)
- Medical compartment narrowing, patellofemoral and medial compartment chondromalacia, and a medial meniscus tear of the right knee and right thigh atrophy.  (<u>Id.</u> at 1107.)
- A small Baker's cyst, small joint effusion, and posterior horn medial meniscus tear of the left knee.  (<u>Id.</u> at 1108.)

The Final Report found work restrictions for Plaintiff that precluded (1) heavy lifting at or above shoulder level bilaterally, (2) any work at or above shoulder level with regards to the left shoulder, (3) more than light work or lifting greater than ten pounds with the left arm, (4) very heavy lifting with the right upper extremity and hand, (5) heavy lifting with the left upper extremity, (6) repetitive fine motion of either hand, (7) heavy lifting, repetitive squatting, kneeling, running, jumping, athletic activities, or repetitive work on uneven surfaces, or (8) prolonged positioning of the cervical spine.  (<u>See</u> <u>id.</u> at 1095-1110).

### 3.    Dr. McKenna

Dr. McKenna, a board-certified internal medical physician and medical expert, testified at Plaintiff's prior hearing before ALJ Breen on April 21, 2020.  (<u>See</u> <u>id.</u> at 105.)  Although Dr. McKenna's testimony is absent from the Administrative Record, ALJ Messer's May 5, 2021 decision recounts Dr. McKenna's testimony as follows:

> Dr. McKenna testified that his a [sic] review of the objective medical record supported the severe medically determinable impairments of degenerative disc disease of the cervical spine and lumbar spine; left shoulder injury with tendinopathy and tear status post arthroscopic repair, porphyria, and degenerative joint disease of the right knee. He did not believe the claimant met or equaled a medical listing. Dr. McKenna opined the claimant could perform light work with frequent, but not continuous pushing and pulling with the left upper extremity; frequent fine and gross manipulation with the left upper extremity; never climb ladder/rope/scaffolds; frequently climb ramp and stairs; and avoid the outdoors or sun.

(Id. at 27.)

## IV.   DISPUTED ISSUES

As reflected in the parties' Joint Motion for Judicial Review, Plaintiff raises the following issues as the grounds for reversal:

1.   Whether the ALJ properly considered the medical opinions of Drs. Tabibian and Siebold.  (J. Mot. at 2:20-21 (arguing that "[t]he ALJ committed legal error by failing to articulate the reasons for rejecting the opinions of Dr. Tabibian and Dr. Siebold."); 5:19-20 (asserting that "Plaintiff argues, but fails to show, that the ALJ committed reversible error when evaluating medical opinions from Drs. Tabibian and Siebold").)

2.   Whether the ALJ properly evaluated Plaintiff's subjective symptom testimony.  (J. Mot. at 8:25-26 (arguing that "[t]he ALJ failed to comply with Social Security Ruling 16-3p and 20 C.F.R. § 404.1529 in evaluating Plaintiff's symptoms."); 12:4-5 (asserting that "[a]ffirmance is warranted because the ALJ properly discounted Plaintiff's claims of limitations from dizziness.").)

## V.   STANDARD OF REVIEW

Section 405(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited, and the denial of benefits will not be disturbed if it is supported by substantial evidence in the record and contains no legal error.  See Molina v. Astrue,

674 F.3d 1104, 1110 (9th Cir. 2012), superseded by regulation on other grounds.

The Court must affirm the Commissioner's decision if it is "supported by substantial evidence and based on the application of correct legal standards." Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (per curiam).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  Substantial evidence means "more than a mere scintilla but less than a preponderance." Id.  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "weigh both the evidence that supports and the evidence that detracts from the ALJ's factual conclusions." Gutierrez v. Comm'r of Soc. Sec., 740 F.3d 519, 523 (9th Cir. 2014) (internal quotation omitted).  When evidence is "susceptible to more than one rational interpretation, one of which supports the ALJ's decision," the Court must uphold the ALJ's conclusion. Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).  The Court may consider "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [he or she] did not rely." Revels v. Berryhill, 874. F.3d 648, 654 (9th Cir. 2017) (internal quotation omitted).

Error in a social security determination is subject to a harmless-error analysis. Ludwig v. Astrue, 681 F.3d 1047, 1054 (9th Cir. 2012).  "[A]n error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the ALJ's ultimate conclusion." Molina, 674 F.3d at 1115 (internal quotation omitted).  The Court must "look at the record as a whole to determine whether the error alters the outcome of the case." Id.  An error that is "inconsequential to the ultimate nondisability determination" is harmless. Id. (internal quotation omitted).

## VI.   DISCUSSION

### A.   The ALJ's Evaluation of Medical Opinion Evidence

Plaintiff contends that the ALJ improperly rejected the medical opinions of Drs. Tabibian and Siebold under the required "supportability" and "consistency" standards of

20 C.F.R. § 404.1520c(c).  (See J. Mot. at 2.)  Both of these opinions, which were rendered in the context of state workers' compensation claims, contain limitations assessments that are not equivalent to the ones used in describing a social security claimant's work restrictions.  As explained further below, the Court concludes that the ALJ committed legal error in evaluating both of these opinions and **ORDERS** that the case be remanded to the Social Security Administration for further development of the record.

### 1.    Applicable law

In evaluating the intensity and persistence of a claimant's symptoms, an ALJ must consider all the available evidence from the claimant's "medical sources and nonmedical sources about how [the claimant's] symptoms affect [the claimant]."  20 C.F.R. § 404.1529(c)(1).  Medical opinions are more persuasive if they are supported by explanations and objective medical evidence, 20 C.F.R. § 404.1520c(c)(1), and if they are consistent with the evidence from other medical and nonmedical sources, id. § 404.1520c(c)(2).  Furthermore, the medical opinion of a specialist "about medical issues related to his or her area of specialty" is more persuasive than that of a non-specialist.  Id. § 404.1520c(c)(4).  The purpose, length, and extent of a medical source's treatment relationship with the claimant, the kinds and extent of examinations and testing performed, and the frequency of the claimant's visits, may also demonstrate a medical source's knowledge and understanding of the claimant's impairments.  Id. § 404.1520c(c)(3)(i)-(v).  In addition, a medical source's familiarity with other evidence in a claim may make the medical source's opinion more persuasive.  Id. § 404.1520c(c)(5).

Revised regulations apply to an ALJ's analysis of medical opinion evidence for claims filed on or after March 17, 2017.  See Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844-01, at 5867-68 (Jan. 18, 2017).  Under these rules, an ALJ is no longer required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)."  20 C.F.R. § 404.1520c(a).  The ALJ must instead consider all the medical opinions in the

record and evaluate each medical opinion's persuasiveness using factors including supportability, consistency, relationship with the claimant, and specialization.  Id.  The two most important factors in determining a medical opinion's persuasiveness are the opinion's "supportability" and "consistency."  20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Although an ALJ is not required to explain how he or she considered each medial opinion from a single medical source in a piecemeal fashion, 20 C.F.R. § 404.1520c(b)(1), an ALJ must articulate "how [he or she] considered the supportability and consistency of factors for a medical source's medical opinions . . . in [his or her] decision."  20 C.F.R. §§ 404.1520c(b)(2), 416.1520c(b)(2).

With supportability, the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s), the more persuasive the medical opinions . . . will be."  20 C.F.R. §§ 404.1520c(c), 416.920c(c)(2).  For consistency, the "more consistent a medical opinion(s) . . . is with the evidence from other medical sources in the claim, the more persuasive the medical opinion(s) . . . will be."  20 C.F.R. §§ 404.1520c(c)(2), 416.320c(c)(2).  Additionally, in reviewing the ALJ's decision, the Court must consider whether the ALJ's analysis has the support of substantial evidence.  See 42 U.S.C. § 405(j); see also Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).

The Ninth Circuit has recently held that the revised rules displace longstanding case law requiring an ALJ to provide "specific and legitimate" or "clear and convincing" reasons for rejecting a medical source's opinion.  See Woods v. Kijakazi, 32 F.4th 785, 787 (9th Cir. 2022).  Nevertheless, in rejecting an examining or treating doctor's opinion under the supportability and consistency factors of the new rules, an ALJ must still provide an explanation supported by substantial evidence.  See id.  Accordingly, the ALJ "must 'articulate . . . how persuasive' [they] find 'all of the medical opinions' from each doctor or other source . . . and 'explain how [they] considered the supportability and consistency factors in reaching these findings."  Id. at 792 ((citing 20 C.F.R. §§ 404.1520c(b), 404.1520(b)(2)).

The revised rules do not, however, replace all previous caselaw within the Ninth Circuit.  For example, it is still impermissible for an ALJ to cherry-pick evidence in discounting a medical opinion.  See, e.g., Shirley C. v. Comm'r Soc. Sec. Admin., Case No. 1:20-cv-01212-MK, 2021 WL 3008265, at *8 (D. Or. July 15, 2021) ("[t]he new regulations do not, however, displace the Ninth Circuit's entire body of caselaw relating to medical evidence, which remain binding on this Court.  For example, it remains true that ALJs may not cherry-pick evidence in discounting a medical opinion."); see also Ghanim v. Colvin, 763 F.3d 1154, 1162 (9th Cir. 2014); Holohan v. Massanari, 246 F.3d 1195, 1207 (9th Cir. 2001) (reversing an ALJ's selective reliance "on some entries in [the claimants records while ignoring] the many others that indicated continued, serious impairment").  Nor, for instance, may an ALJ dismiss medical opinions without providing a detailed explanation for doing so:

> To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required, even when the objective factors are listed seriatim.  The ALJ must do more than offer his own conclusions. [They] must set forth [their] own interpretation and explain why they, rather than the doctors', are correct.

Regenmitter v. Comm'r of Soc. Sec. Admin., 166 F.3d 1294, 1299 (9th Cir. 1999) (internal quotation omitted); see also Deawendoe S. M. v. Comm'r, Soc. Sec. Admin., Case No. 6:21-cv-01140-CL, 2023 WL 2645664, at *10 (D. Or. Mar. 27, 2023) (citing Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991)) ("while the new regulations eliminate the previous hierarchy of medical opinion evidence that gave special status to treating physicians, ALJs must still provide sufficient reasoning for federal courts to engage in meaningful appellate review"); see also Bunnell, 947 F.2d at 346 ("a reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection" of certain evidence"); see also Treichler v. Comm'r of Soc. Sec. Admin, 775 F.3d 1090, 1103 (9th Cir. 2014) ("Although the ALJ's analysis need not be extensive, the ALJ must

provide some reasoning in order for us to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence.")

### 2. Dr. Tabibian

In the July 1, 2019 worker's compensation report provided "to address [Plaintiff's] current orthopedic residuals and the resulting permanent disability/impairment arising out of . . . the course of employment[,]" Dr. Tabibian opined that Plaintiff's injuries "with regard to the bilateral knees" preclude him from "prolonged weightbearing." (AR at 1041, 1067; see also Section IV(B)(2), supra (discussing Dr. Tabibian's opinion more fully).)  In addressing Dr. Tabibian's opinion, the ALJ reasoned as follows:

> With regard to the left shoulder, he was precluded from lifting greater than 10 pounds, repetitive or forceful pushing, pulling, and repetitive above shoulder reaching.  With regard to the bilateral knees, [Plaintiff] was precluded from repetitive kneeling, squatting, climbing, or prolonged weight-bearing . . . The undersigned notes that Dr. Tabibian had previously assessed very similar restrictions in 2017 and 2018 in prior Permanent and Stationary reports.  [See id. at 709, 746].

> The undersigned finds Dr. Tabibian's opinions partially persuasive as it related to the left upper extremity limitations. The restrictions are supported by the claimant's history of left upper extremity surgery and clinical findings related to that limb. The opinion is also consistent with the claimant's subjective complaints of left upper extremity pain.  However, complete preclusion of lifting no more than 10 pounds even with the right upper extremity is not persuasive as it is not supported by the negative orthopedic tests on the right and the claimant's ability to perform daily tasks such as taking out the trash and carrying groceries, presumably using the dominant right upper extremity. The doctor's assessments also do not reflect limitations for standing and walking and as such, they're only partially complete for purposes of determining the claimant's residual functional capacity under SSA standards.

(Id. at 25-26.)  The ALJ's ultimate RFC determination included postural and climbing restrictions, but it did not include any limitations with respect to weightbearing, standing,

1  or walking, apart from those typically associated with light work.  (See id. at 22.)

2  Plaintiff contends that this omission constitutes an improper rejection of Dr. Tabibian's

3  opinion.  (See J. Mot. at 4:27-28 ("The ALJ's failure to articulate any reason for rejecting

4  Dr. Tabibian's opinion with respect to standing and walking constitutes legal error

5  demanding remand.").)  Citing to the Lower Extremity Guidelines of the April 1997

6  California Department of Industrial Relations, Division of Workers' Compensation,

7  Schedule for Rating Permanent Disabilities (the "Schedule"), which "indicates that a

8  Disability Precluding Prolonged Weight-Bearing 'contemplates ability to do work

9  approximately 75% of time in standing and walking position, and requires sitting

10  approximately 25% of the time,'" Plaintiff argues that Dr. Tabibian's restriction from

11  prolonged weightbearing precludes him from any of jobs the ALJ determined he was

12  capable of performing using an RFC that limited him to light work under the agency's

13  regulations—which contemplate standing and walking for a minimum of six hours out of

14  an eight-hour workday.  (J. Mot. at 3:23-4:1-2; see also id. at 4:4-6.)  After noting that

15  medical evidence in the record supports standing and walking limitations beyond the ones

16  in the ALJ's RFC determination, Plaintiff argues that "[t]he ALJ's failure to articulate

17  any reason for rejecting Dr. Tabibian's opinion with respect to standing and walking"

18  under the new regulations was legal error requiring remand.  (Id. at 4:27-28.)

19          In response, Defendant contends that "Dr. Tabibian's finding concerning

20  prolonged weightbearing did not constitute a concrete assessment of standing or walking

21  capabilities sufficient for inclusion in an RFC."  (Id. at 6:1-4.)  Even assuming that Dr.

22  Tabibian's opinion could be perceived as precluding Plaintiff from standing and walking

23  for six hours in an eight-hour workday, Defendant points to medical evidence, as well as

24  Plaintiff's own reports to physicians and the ALJ that undermine standing and walking

25  restrictions beyond those assessed in his RFC.  (See id. at 6-7.)  As Defendant puts it, the

26  ALJ's RFC finding properly accounted for all of Plaintiff's knee-related limitations, and

27  should therefore be upheld.  (See id. at 7:20-8:5.)

28

22cv906-LR

Plaintiff's arguments are more convincing here.  At the outset, the Court notes that there does not seem to be a clear consensus within the Ninth Circuit as to whether a prohibition against "prolonged weightbearing" is inconsistent with the requirements of standing and walking for six hours in an eight-hour workday that are typically associated with light work under the Social Security Administration's regulations.  Compare Meza v. Berryhill, Case No. 5:16-cv-01286-KS, 2017 WL 3334243, at *4 (C.D. Cal. Aug. 4, 2017) ("this Court has previously rejected an ALJ's conclusion that a plaintiff who was precluded against prolonged weight-bearing could perform light work which required standing or walking for six hours in an eight-hour day."), Jenkins v. Astrue, 628 F. Supp. 2d 1140, 1149 (C.D. Cal. 2009) ("A preclusion against 'prolonged weight-bearing' (that is, prolonged standing or walking) is not . . . consistent with the ability to perform the full range of light work, which requires standing or walking for six hours in an eight-hour day."), and Allison L. W. v. Berryhill, Case No. 8:18-cv-01704-KES, 2019 WL 2303834, at *2-3 (C.D. Cal. May 30, 2019) (concluding that a restriction against "prolonged" sitting and walking was not consistent with the requirements of light work), with Martinez V. v. Saul, NO. CV 20-5675-KS, 2021 WL 1947238, at *6 (C.D. Cal. May 14, 2021) ("The Central District has generally determined that a preclusion on 'prolonged weight-bearing' in the workers' compensation context equates to a preclusion on prolonged standing or walking—not a preclusion on standing and walking entirely—and, therefore is consistent with the definition of 'light work.'"), George A. v. Berryhill, Case No. 5:18-cv-00405-AFM, 2019 WL 1875523, at *3 (C.D. Cal. Apr. 24, 2019) ("a physician's opinion rendered in the workers' compensation context that a claimant is precluded from prolonged weight-bearing is not inconsistent with an RFC allowing for standing and/or walking for six-hours in an eight-hour day."), and Rivera v. Colvin, NO. CV 14 -09217-KS, 2016 WL 94231, at *3-4 (C.D. Cal. Jan. 7, 2016) ("[t]he amount of time Plaintiff is deemed capable of standing while performing work is essentially the same under both standards . . . Seventy-five percent of 8 hours is exactly 6 hours.").

1    The question of whether a restriction on prolonged weightbearing is ultimately

2    inconsistent with the standing and walking requirements of light work under Social

3    Security regulations, however, is unnecessary for the Court to reach at this juncture.

4    Although Dr. Tabibian's report was rendered in the context of a workers' compensation

5    claim, a restriction against prolonged weightbearing was probative evidence in the

6    administrative record that the ALJ was required to address—and could have resulted in a

7    different RFC calculation if properly analyzed under the supportability and consistency

8    factors of 20 C.F.R. § 404.1520c(c)(1) and (c)(2).  Indeed, the fact that a clear consensus

9    does not exist within the Ninth Circuit as to whether a prohibition from prolonged

10   weightbearing is inconsistent with an RFC finding of light work demonstrates that it was

11   the ALJ's job to make this determination under the Social Security Administration's

12   standards, rather than the Court's.  In evaluating workers' compensation records, 20

13   C.F.R. § 404.1504 provides:

> Other governmental agencies and nongovernmental entities—
> such as ... State agencies ... —make disability, blindness,
> employability, Medicaid, workers' compensation, and other
> benefits decisions for their own programs using their own rules.
> Because a decision by any other governmental agency or a
> nongovernmental entity about whether you are disabled, blind,
> employable, or entitled to any benefits is based on its rules, it is
> not binding on us and is not our decision about whether you are
> disabled or blind under our rules. Therefore, in claims filed (see
> § 404.614) on or after March 27, 2017, we will not provide any
> analysis in our determination or decision about a decision made
> by any other governmental agency or a nongovernmental entity
> about whether you are disabled, blind, employable, or entitled to
> any benefits. *However, we will consider all of the supporting
> evidence underlying the other governmental agency or
> nongovernmental entity's decision that we receive as evidence in
> your claim in accordance with § 404.1513(a)(1) through (4).*

26   (emphasis added).  While the regulations clearly explain that an ALJ is not bound by a

27   worker's compensation decision as to whether a plaintiff is disabled or entitled to

28   benefits, they also direct that the evidence underlying a state agency decision must still be

considered.  See id.  Additionally, numerous courts within the Ninth Circuit have noted that an ALJ "'may not disregard a physician's medical opinion simply because it was initially elicited in a state workers' compensation proceeding, or because it is couched in terminology used in such proceedings.'"  See Gonzales v. Kijakazi, Case No. 1:21-cv-00129-JLT-HBK, 2022 WL 4484098, at *5 (E.D. Cal. Sept. 27, 2022) (quoting Booth v. Barnhart, 181 F. Supp. 2d 1099, 1105 (C.D. Cal. 2002)).

Here, apart from a single sentence acknowledging Dr. Tabibian's finding that Plaintiff was precluded from prolonged weightbearing (AR at 25), the ALJ's opinion did not adequately address this restriction using the factors required by the new regulations. Rather, the ALJ ignored this part of Dr. Tabibian's opinion, noting that it did not "reflect limitations for standing and walking," and was "only partially complete for purposes of determining [Plaintiff's RFC] under SSA standards."  (Id. at 25-26.)  This was not sufficient reasoning for the ALJ to omit this part of Dr. Tabibian's findings from his decision.  See Hill v. Astrue, 698 F.3d 1153, 1161 (9th Cir. 2012) (explaining that when the ALJ ignores probative evidence in the record that could have been favorable to a claimant, the ALJ "thereby provide[s] an incomplete . . . [disability] determination."). Further still, the ALJ failed entirely to explain how he considered the supportability and consistency factors of this part of Dr. Tabibian's opinion.[5]  See Woods v. Kijakazi 32 F.4th 785, 792 (9th Cir. 2022) ("The agency must 'articulate . . . how persuasive' it finds '*all of the medical opinions*' from each doctor or other source, 20 C.F.R. § 404.1520c(b), and 'explain how [it] considered the supportability and consistency factors' in reaching these findings, id., § 404.1520c(b)(2).") (emphasis added).  The lack of any sort of analysis under the supportability and consistency factors related to prolonged

---

[5] Plaintiff argues that the ALJ failed to evaluate Dr. Tabibian's opinion under the discretionary persuasiveness factors of 20 C.F.R. § 404.1520c(c)(3)-(c)(5) because the ALJ adopted Dr. McKenna's opinion over Dr. Tabibian's without sufficient reasoning.  (See J. Mot. at 4:14-26.)  Because the Court concludes that the ALJ failed to analyze Dr. Tabibian's opinion under the *required* factors of supportability and consistency, however, the Court need not reach this part of Plaintiff's argument.

weightbearing is especially perplexing to the Court given that elsewhere in the opinion the ALJ included some analysis of how limitations in the workers' compensation context translated to restrictions under Social Security regulations.  (See, e.g., AR at 25 ("Dr. Siebold failed to quantify 'heavy' lifting, but this is not inconsistent with a range of light exertional capacity to work.").[7]  The ALJ's findings related to the prolonged weightbearing assessment in Dr. Tabibian's opinions were therefore not supported by substantial evidence.  See, e.g., Gonzales, 2022 WL 4484098, at *5 (concluding that an ALJ's reasoning for ignoring a medical opinion because it was rendered in workers' compensation terms was unsupported by substantial evidence); Ana A. v. Kijakazi, Case No. 2:20-cv-11376-GJS, 2022 WL 3348929, at *3 (C.D. Cal. Aug. 12, 2022) (concluding that an ALJ erred by failing to explain why work restrictions assessed as part of a workers' compensation were rejected).

Defendant's *post-hoc* assurances that the ALJ's RFC finding adequately "accounted for . . . Plaintiff's knee-related limitations" without addressing the weightbearing restriction assessed by Dr. Tabibian are unavailing.  (J. Mot. at 6-8.) Citing to findings elsewhere in the record, as well as Plaintiff's own reports about knee-related restrictions, Defendant asserts that "Plaintiff fails to show that the evidence necessitated finding a knee-related limitation to standing and/or walking for less than six hours total in an eight-hour workday as a matter of law."  (J. Mot. at 7:17-19.)  The problem with this reasoning, however, is that it was not presented by the ALJ in the decision itself.  See Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1225 (9th Cir. 2009) ("[l]ong standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc*

---

[7] Defendant argues that the "[n]either the Commissioner's regulations nor rulings equate the term 'prolonged' to a specific amount of time." (J. Mot. at 6.)  While this may be true, it still does not absolve the ALJ of his duty to treat a restriction from "prolonged weightbearing" as a medical opinion that needed to be considered under the regulations—just as the ALJ did elsewhere in the opinion.  (See, e.g., AR at 26 ("the preclusion of heavy lifting is not inconsistent with the claimant's orthopedic history, even though Dr. Siebold failed to articulate the amount of weigh that constituted 'heavy.'").)

rationalizations that attempt to intuit what the adjudicator may have been thinking."). The weightbearing restriction by Dr. Tabibian as it related to Plaintiff's bilateral knees—at the very least—presents a medical finding that the ALJ was required to address using the supportability and consistency factors under 20 C.F.R. § 404.1520c(c)(1)-(2).  While this analysis did not need to be extensive, insufficient information exists in the ALJ's decision for the Court to undertake meaningful appellate review of how the ALJ considered the weightbearing restriction in Dr. Tabibian's opinion.

Because a reviewing court cannot consider an error harmless unless it "can confidently conclude that no reasonable ALJ, when fully crediting the [evidence], could have reached a different disability determination," Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1056 (9th Cir. 2006), the Court cannot conclude that the ALJ's error in evaluating Dr. Tabibian's opinion was harmless.  On remand, the ALJ must properly evaluate this opinion along with the other relevant evidence in the record.

### 3.   Dr. Siebold

In his August 12, 2019 report made in the workers' compensation context, Dr. Siebold opined that Plaintiff was precluded from work which included "repetitive fine manipulation" with either hand.  (See AR at 26; see also id. at 1081, 1101, 1103.)  While the ALJ disagreed with some of Dr. Siebold's recommendations regarding Plaintiff's lower body, the ALJ concurred with Dr. Siebold's recommendation precluding left-handed repetitive fine manipulation:

> This assessment is partially persuasive.  Again, the preclusion of heavy lifting is not inconsistent with the claimant's orthopedic history, even though Dr. Siebold failed to articulate the amount of weight that constituted 'heavy[.]'  The restrictions that pertain only to the left upper extremity is supported by his history of left shoulder surgery and positive orthopedic tests of the left upper extremity.  The complete preclusion of repetitive squatting and kneeling is not entirely supported by the record, which note the knee ligaments are intact . . .

(AR at 26.)

Later in the decision, the ALJ recounted Dr. McKenna's April 2021 testimony[8] that Plaintiff "could perform . . . frequent fine and gross manipulation with the left upper extremity." (Id. at 27.) In discussing the persuasiveness of this opinion, the ALJ reasoned as follows:

> The undersigned finds Dr. McKenna's opinion persuasive. It is supported by the claimant's history of neck and left shoulder injury with arthroscopic repair and ongoing left upper extremity examination findings. It is consistent with the claimant's subjective complaints of pain and his reported ability to perform daily tasks such as taking out the trash and shopping. However, the undersigned has also fully considered the claimant's history of mild carpal tunnel syndrome and modest MRI findings of the right shoulder and spine the benefit of the doubt, such that, in combination with the established left upper extremity issues, would support bilateral manipulative and reaching limitations.

(Id.)

Plaintiff's RFC states that he can "frequently handle and finger with the non-dominant left upper extremity." (Id. at 22.) The ALJ's decision did not discuss any of the differences between the opinions of Drs. Siebold and McKenna. (See generally id. at 22-29.) Plaintiff argues that the ALJ thus erroneously adopted Dr. McKenna's opinion while ignoring Dr. Siebold's assessed limitations and failing to sufficiently discuss their persuasiveness. (J. Mot. at 5:1-14.) In response,[9] Defendant contends that affirmance is

---

[8] The Court notes once again that only the ALJ's summary of Dr. McKenna's testimony within the ALJ's decision is available for the Court to review in the administrative record. Any citations to Dr. McKenna's testimony are to the ALJ's summary of Dr. McKenna's statement's during Plaintiff's first administrative hearing.

[9] Defendant also argues that "Plaintiff does not provide a citation to the record for this alleged restriction, and the opinion the ALJ cited to from Dr. Siebold does not appear to set forth any such restriction (AR 24, 1187)." Plaintiff's citation to the record in the Joint Motion points to the ALJ's summary of an August 2019 report by Dr. Siebold, which does assess limitations that limit Plaintiff to "no repetitive fine manipulation of the left hand." (See id. at 26 (citing id. at 1103; see also id.at 1101.) The Court will therefore only address Defendant's argument that Plaintiff's RFC properly accounted for this limitation.

proper because fine manipulation restrictions are "consistent with Plaintiff's RFC for, at most, frequent handling and fingering with the left upper extremity." (J. Mot. at 8:14-17.)

For similar reasons to the ones requiring the reconsideration of Dr. Tabibian's opinion, Plaintiff's arguments are more convincing with respect to Dr. Siebold's opinion as well. Most importantly, the ALJ did not reconcile the differences between the restriction from "repetitive fine manipulation" assessed by Dr. Siebold, and the limitation to "frequent . . . fine manipulation" assessed by Dr. McKenna.[10] Courts have noted that in workers' compensation terms, "a restriction from 'repetitive' motion indicates a 50% loss of pre-injury capacity." See Alvarado v. Comm'r of Soc. Sec., Case No. 8:17-CV-00566 (VEB), 2018 WL 4616344, at *5 (C.D. Cal. Sep. 24, 2018). On the other hand, in Social Security parlance, a restriction to performing an action "frequently" is generally considered to include performing the activity up to two-thirds of an eight-hour workday. See Nguyen v. Colvin, No. SA CV 12–1837–PJW, 2013 WL 6536732, at *1 (C.D. Cal. Dec. 12, 2013) (quoting Social Security Ruling 83–10) ("'frequent is defined as existing more than 1/3 of the workday up to 2/3 of the work day.[']"). Although it could be

_____

[10] The Court is aware of some instances within the Ninth Circuit in which "fine manipulation" is considered a distinct subcategory of a "fingering" restriction for the purposes of determining a claimant's RFC. See, e.g., Emma C. v. Kijakazi, No. 20CV1681-LR, 2023 WL 2556837, at *4-5 (S.D. Cal. Mar. 17, 2023) ("Other district courts in this circuit have also found "fine manipulations" to be more specific than, and a subcategory of, 'fingering.'"). These cases, however, are usually limited to situations in which the claimant's ability to perform fine manipulations is addressed as a separate limitation from general fingering when fine or delicate tasks are required. See Thomure v. Colvin, No. EDCV 12-1992-DTB, 2014 WL 1225016, at *2–3 (C.D. Cal. Mar. 21, 2014) ("[A] claimant restricted from fine fingering does not necessarily mean that the claimant cannot perform fingering in general where fine, delicate work is not required."). Because neither the ALJ nor the VE during the hearing or in the written decision made the distinction between Plaintiff's ability to perform fingering in general with fine or delicate work, the Court assumes that the ALJ equated Plaintiff's assessed limitations on "fine manipulation" to those related to "fingering" in general when calculating the RFC. See Gallardo v. Colvin, No. 1:12-CV-1406-SKO, 2014 WL 824227, at *12 (E.D. Cal. Mar. 3, 2014) ("[C]ourts in this circuit have generally concluded that 'fine manipulation' is equivalent to 'fingering.'"). If the ALJ intended to address "fine manipulation" restrictions separately from fingering requirements, this is yet another area that can be clarified on remand.

argued that the ALJ included the functional limitations in Dr. McKenna's opinion of restricting Plaintiff to *frequent* "fine and gross manipulation," the terms "frequent" and "repetitive" are not necessarily consistent with each other.  See, e.g., Benny R. A. v. Saul, Case No. 8:20-cv-00878-JDE, 2021 WL 1313598, at *6 (C.D. Cal. Apr. 8, 2021) ("'frequently' appears to conflict with 'repetitive,' but it is not entirely clear from the case law."); Victor v. Astrue, No. CV 10–7674–PJW, 2011 WL 4829387, at *1 (C.D. Cal. Oct. 11, 2011) ("'Repetitive' is not synonymous with 'frequent.' 'Repetitive' refers to a type of action that is repeated. 'Frequent' refers to how often an action is performed.").  Because the ALJ failed to translate Dr. Siebold's restriction against repetitive fine manipulation, the Court cannot undertake meaningful review of the ultimate RFC determination.  See 20 C.F.R. § 404.1504; Brown-Hunter v. Colvin, 806 F.3d 487, 492 (9th Cir. 2015) (federal courts "demand that the agency set forth the reasoning behind its decisions in a way that allows for meaningful review.").

Moreover, the ALJ failed on a more fundamental level to consider Dr. Siebold's restriction against repetitive fine manipulation with specificity under the new regulations. See Reynoldson v. Comm'r of Soc. Sec., CASE NO. 21-cv-1041-LK, 2023 WL 128969, at *3 (W.D. Wash. Jan. 9, 2023) (quoting Woods, 32 F.4th at 787) ("although the new regulations displace . . . longstanding case law requiring an ALJ to provide specific and legitimate reasons for rejecting an examining doctor's opinion, the ALJ's decision— including the decision to discredit any medical opinion—must still be supported by substantial evidence.") (internal quotations omitted).  In fact, the ALJ's opinion appears to *credit* Dr. Siebold's limitations assessment with respect to Plaintiff's upper extremity, noting that "[t]he restrictions that pertain only to the left upper extremity is supported by his history of left shoulder surgery and positive orthopedic tests of the upper extremity." (AR at 26.)  The lack of any meaningful discussion of the persuasiveness of Dr. Siebold's restriction against repetitive fine manipulation alone necessitates remand.

Finally, even if there was some overlap between the restriction against repetitive fine manipulation assessed by Dr. Siebold (a possible 50% reduction in Plaintiff's

26

1   capacity to perform fine manipulation) and a limitation to frequent fine manipulation

2   assessed by Dr. McKenna (that Plaintiff could possibly be able to perform fine

3   manipulation between one-third and two-thirds of an eight-hour workday), the Court

4   cannot conclude that the ALJ's failure to reconcile these findings was harmless.  Each of

5   the representative occupations identified by the VE in the ALJ's step four determination

6   would require Plaintiff to perform at least occasional fingering.  See DOT 222.387-074,

7   Shipping and Receiving Weigher (requiring occasional fingering up to one-third of the

8   time); DOT 211.462-010, Cashier (requiring frequent fingering); DOT 209.587-034,

9   Marker (requiring frequent fingering).  Caselaw within the Ninth Circuit does not clearly

10   indicate whether these requirements would conflict with a restriction against repetitive

11   fingering, and the Court declines to make such a finding here.  See Benny R. A., 2021

12   WL 1313598, at *6 (discussing the disconnect between these requirements and workers'

13   compensation restrictions).  Because the Court cannot confidently conclude that no

14   reasonable ALJ, when fully crediting the [evidence], could have reached a different

15   disability determination," Stout, 545 F.3d at 1056, the Court concludes that the ALJ's

16   error in evaluating Dr. Siebold's opinion was not harmless.  On remand, the ALJ must

17   also properly evaluate this opinion.

18   **B.     Other Assignments of Error**

19         Because the ALJ's failure to properly evaluate the medical opinion evidence is

20   sufficient to determine that remand is appropriate, the Court declines to reach Plaintiff's

21   other assignments of error, primarily related to Plaintiff's subjective symptom testimony.

22   See, e.g., Hiler v. Astrue, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the

23   case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative ground

24   for remand."); Gregory T. v. Saul, No. 1:19-cv-03116-MKD, 2020 WL 4730966, at *9

25   (E.D. Wash. May 12, 2020) (declining to reach the plaintiff's subjective symptom

26   testimony when medical opinion evidence needed to be reevaluated on

27   remand); Linkswiler v. Colvin, CASE NO. 3:16-CV-05158-DWC, 2016 WL 5817055, at

28   *8 (W.D. Wash. Oct. 5, 2016) ("an evaluation of a claimant's credibility relies, in part, on

1  an accurate assessment of the medical evidence") (citing 20 C.F.R. §§
2  404.1529(c), 416.929(c)).

### VII.   REMAND

4          A reviewing court has discretion to remand an action for further proceedings or for
5  a finding of disability and an award of benefits.  See, e.g., Stone v. Heckler, 761 F.2d
6  530, 533 (9th Cir. 1985) (decision of whether to remand for further proceedings or
7  remand for immediate payment of benefits is within the discretion of the reviewing
8  court).  Whether an action is remanded for further proceedings or for an award of benefits
9  depends on the likely utility of additional proceedings.  Harman v. Apfel, 211 F.3d 1172,
10  1179 (9th Cir. 2000).  In determining whether an award of benefits is warranted, the
11  Court conducts the "three-part credit-as-true" analysis.  Garrison v. Colvin, 759 F.3d 995,
12  1020 (9th Cir. 2014).  Under this analysis the Court considers whether: (1) the ALJ has
13  failed to provide legally sufficient reasons for rejecting evidence; (2) the record has been
14  fully developed and further proceeding would serve no useful purpose; and (3) if the
15  improperly discredited evidence is credited as true, the ALJ would be required to find the
16  claimant disabled on remand.  See Dominguez v. Colvin, 808 F.3d 403, 407 (9th Cir.
17  2015).

18          Even if all the requisites are met, however, the court may still remand for further
19  proceedings "when the record as a whole creates serious doubt as to whether the claimant
20  is, in fact, disabled[.]"  Garrison, 759 F.3d at 1021.  "Serious doubt" can arise when there
21  are "inconsistencies between the claimant's testimony and the medical evidence," or if the
22  Commissioner "has pointed to evidence in the record the ALJ overlooked and explained
23  how that evidence casts into serious doubt" whether the claimant is disabled under the
24  Act.  Dominguez, 808 F.3d at 407 (quoting Burrell v. Colvin, 775 F.3d 1133, 1141 (9th
25  Cir. 2014) (internal quotations omitted)).

26          The Court concludes that the "rare circumstances that result in a direct
27  award of benefits are not present in this case."  Leon v. Berryhill, 880 F.3d 1041, 1047
28  (9th Cir. 2017).  Where—as happened here—the ALJ does not state legally sufficient

reasons for discounting medical opinion evidence, further administrative proceedings could remedy the ALJ's errors, and remand is appropriate.  See, e.g., Butterworth v. Kijakazi, Case No. 1:21-cv-00374-ADA-HBK, 2023 WL 4534481, at *8 (E.D. Cal. July 13, 2023) (finding that the ALJ could have developed the record further when the reasons presented for rejecting medical opinion evidence were not supported by substantial evidence).

## VIII.   CONCLUSION

For the reasons set forth above, the Court concludes that remand for further proceedings is warranted because additional administrative proceedings could remedy the defects in the ALJ's analysis of the medical opinions of Drs. Tabibian and Siebold. Accordingly, the Court **ORDERS** that judgment be entered **REVERSING** the decision of the Commissioner and **REMANDING** this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**

Dated:  September 15, 2023

_____

Honorable Lupe Rodriguez, Jr.
United States Magistrate Judge

22cv906-LR